UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**14CV3798**

- - - - - - - - - - - - - - - - - )

JEREMY ZIELINSKI, Register No.
25835-018,                                )
                                          )
MICHAEL MATERASSO, Register No.           )
58703-054,                                )
                                          )
MICHAEL NAGELL, Register No.              )
25969-038,                                )
                                          )
JABAREE PERRY, Register No.               )
57969-056, and                            )
                                          )
DAVID BABENZIEN, Register No.             )
18656-052,                                )
                    Petitioners,          )
                                          )
        v.                                )
                                          )
CATHERINE C. LINAWEAVER, Warden,          )
Metropolitan Correctional Center, and     )
                                          )
CHARLES E. SAMUELS, Director,             )
Federal Bureau of Prisons,                )
                                          )
                    Respondents.          )

- - - - - - - - - - - - - - - - - )

PETITION FOR A WRIT OF HABEAS
CORPUS AND/OR MANDAMUS

Case No. _____

MAY 27 2014

PRO SE OFFICE

The above-named Petitioners, all inmates confined at the Metropolitan Correctional Center NY ("MCC"), allege:

## INTRODUCTION

1. This Petition seeks to remedy a systemic failure by MCC staff to timely review inmates for placement in community correctional facilities ("CCF's") and process associated paperwork, and a failure by the Director of the Bureau of Prisons to establish objective, reliable regulations and guidelines for staff to utilize when determining the duration of CCF recommendations and placements. As a result of these failures, Petitioners and other inmates have been, and continue to be, deprived of consideration for the full period of CCF placement time they are eligible for under 18 U.S.C. § 3624(c)(1), as amended by the Second Chance Act of 2007, Pub. L. 110-199, 122 Stat. 657 (2008) ("SCA"); and determinations of the duration of CCF placements are arbitrary and vary widely between similarly-situated inmates.

2. This Petition also seeks to remedy a systemic failure by the Director to ensure that when the Bureau makes a legitimate, discretionary determination to not transfer an inmate to a CCF, it nevertheless affords such prisoner "conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community" for "a portion of the final months" of his or her sentence, wherever it elects to confine him or her, as required by § 3624(c).

## JURISDICTION

3. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331, 2241, and 1361. Injunctive, declaratory, and further appropriate relief are authorized by 28 U.S.C. §§ 1651, 2201, and 2202.

4.   Each of the petitioners is an inmate confined at MCC serving the "final months" of his sentence.

5.   Respondent CATHERINE C. LINAWEAVER is the Warden of MCC.

6.   Respondent CHARLES E. SAMUELS is the Director of the Bureau of Prisons ("BOP").

FACTS

7.   Under 18 U.S.C. § 3624(c)(1), as amended by the SCA, each prisoner in the custody of the BOP is eligible for up to 12 months of "pre-release custody," that is, confinement under conditions which will "afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." A common form of pre-release custody the BOP utilizes is transfer to and placement in a CCF.[1]

8.   Whether and, if so, how long to transfer an inmate to a CCF is a matter committed to BOP discretion. However, the BOP must exercise its discretion with respect to each inmate on an individualized basis, "consistent with" 18 U.S.C. § 3621(b), and must ensure all CCF placements are "of sufficient duration to provide the greatest likelihood of successful reintegration into the community." 18 U.S.C. § 3624(c)(6). The BOP was required to promulgate regulations to ensure this occurs within 90 days of the SCA taking effect. Id.

9.   Rather than use its expertise to promulgate the regulations required by § 3624, the BOP elected to parrot the language of the statute, see 28 C.F.R. §§ 570.20 – 570.22, and directs staff to follow an internal BOP "Program

_____

1.   CCF's are variously referred to as CCF's, Residential Re-entry Centers, Community Corrections Centers, and halfway houses. For consistency with the current statute, they are referred to as CCF's throughout this litigation.

Statement," entitled "Community Corrections Center (CCC) Utilization and Transfer Procedure," which has not been updated to correspond with the SCA or the BOP's regulations at 570.20 - 570.22. See BOP Program Statement 7310.04 (December 16, 1998) ("PS 7310.04"). It has also issued a number of non-binding interpretive memorandums purporting to satisfy its obligations under § 3624(c)(6). See BOP Memorandums dated April 14, 2008, November 14, 2008, June 24, 2010, and May 24, 2013 ("Guidance Memos").[2]

10. Under P.S. 7310.04 and the Guidance Memos, referral to and placement in a CCF is a multi-step process. First, an inmate's "Unit Team" makes an individualized determination of a recommended range of durations an inmate should spend in a CCF, if any, and "refers" the inmate for CCF placement by transmitting the recommendation to the "Residential Reentry Manager" ("RRM") who oversees the inmate's proposed release city. The RRM reviews the recommendation and makes a final decision on a CCF "acceptance date" on which the inmate will transfer to the CCF selected.

11. PS 7310.04 § 8 states that the Unit Team must complete CCF referrals "no later than 11 to 13 months before an inmate's projected release date." However, the April 14, 2008 Guidance Memo provides that the review must be completed 17 to 19 months before the projected release date to ensure that it is possible for an inmate to receive the statutory maximum 12 months of pre-release custody placement in a CCF. Neither PS 7310.04 or any other Guidance Memo known to petitioners specifies timeframes by which CCF referrals must be completed for inmates with sentences shorter than 17 to 19 months. Nor do they

---

2. The May 24, 2013 and June 24, 2010 memos are attached as Exhibits 1 and 2. A reproduction of the November 14, 2008 memo, from Bowers v. Warden, 2011 U.S. Dist. LEXIS 19583 (D.S.D. Feb. 25, 2011), is attached as Exhibit 3. A full copy of the April 14, 2008 memo could not be located. None of the memos are available in the inmate-accessible Electronic Law Library at MCC.

specify any method of prioritizing evaluation of inmates' individualized evaluations.

12.   Neither PS 7310.04 nor any other Program Statement, regulation, or Guidance Memo known to petitioners contains any sort of explicit, objective criteria to guide or cabin Unit Team discretion in determining how much CCF time to recommend.   The only explicit, clear limitations are that recommendations should ordinarily be made in the form of a range, e.g. 60-90 days, 150-180 days, etc., PS 7310.04 § 9(a); that placements exceeding 180 days are "highly unusual, and only possible with extraordinary justification," id. § 9(a)(1); and that the duration of any court-mandated CCF stays be subtracted from the range which would otherwise be recommended, id. § 9(a).   The May 24, 2013 Memo states that "placement of less than 90 days is typically not considered sufficient to address multiple reentry needs", and that "[t]he number of placement days should be driven primarily by the inmate's needs and risk level (as determined by the BP-338 Custody Classification assessment or BP-337 Security Designation assessment if a BP-338 has not been completed)."   May 24, 2013 Memo at 4.   PS 7310.04 simply declares, without elaboration, that "[s]taff shall make recommendations for [CCF] placements based on an assessment of inmate needs for services, public safety, and the necessity of the Bureau to manage its inmate population responsibly."   § 9(a).   It then goes on to state that "[a] number of factors must be weighed to determine the length of [CCF] placement for inmates, including their individual needs and existing community resources."   Id.   The meanings of these terms are not defined; there is nothing specifying which "individual needs" and "community resources" can or should be considered; there is nothing specifying what weight is to be assigned to any particular factor or combination of factors; and most importantly, there is nothing giving any indication of how any of it translates into the ultimate determination of

how much CCF time should be recommended or approved. The overall effect of the Bureau's current internal operations is that determinations of how much CCF time to recommend or approve have been committed to the unfettered, arbitrary, subjective opinions of individual BOP staff, without any way to objectively review or challenge the results in any case.

13. As a result of the unfettered discretion conferred on staff, CCF placement duration recommendations vary widely between similarly-situated inmates, both between institutions and within single institutions, for no discernible reason. At MCC, it has become utterly impossible for inmates to predict, by anything other than random guessing, how much CCF time, if any, they will be recommended or approved for.

14. The unfettered discretion conferred on staff is compounded by the fact that MCC staff consistently fail, by wide margins and with varying excuses, to meet the deadlines in PS 7310.04 and the Guidance Memos. It is not unheard of for inmates to be released after serving long sentences without ever having received a CCF recommendation. Each of the petitioners, in particular, is either overdue for a referral, and therefore is being deprived of consideration; or their paperwork has been neglected for so long that, according to staff, there is not enough time to complete the referral and approval process to secure placement in a CCF for any duration before their sentences expire.

15. MCC staff's systemic failure to timely process CCF referrals also has deprived and continues to deprive inmates of pre-CCF transfers to minimum security "camps," which they are entitled to under PS 7310.04 § 9(a)(5). That section provides that once the Unit Team processes a CCF referral, inmates who "are otherwise appropriate for camp placement shall be transferred to a camp for intermediate placement ... closer to the inmate's release residence" early enough "to allow the inmate a minimum of a 60 day placement at the camp prior

to the acceptance date at the [CCF]."

16. The CCF referral failures are further exacerbated by the fact that the BOP has not developed any procedures to determine how long an inmate should spend in "pre-release custody" apart from the determination of how long to place them in a CCF; nor has it developed procedures to comply with 18 U.S.C. § 3624(c)(1)'s plain command to provide pre-release conditions regardless of an inmate's pre-release location. The BOP has instead taken what amounts to a "CCF or nothing" approach.

17. The "CCF or nothing" approach is particularly problematic at MCC. Whatever meaning is ascribed to the command of § 3624(c)(1) that inmates be afforded "a reasonable opportunity to adjust to and prepare for ... reentry ... into the community," the conditions of MCC fall far short. Petitioners and other inmates who are serving the "final months" of their sentences at MCC are confined under the exact same highly-restrictive conditions as high-security pretrial detainees, sometimes on the same units. Despite the availability of "practicable," § 3624(c)(1), alternatives to the present conditions, petitioners and other inmates at MCC in the "final months" of their sentences have no opportunity or means to strengthen family and community ties, seek and secure employment, accrue release funds, secure a residence, or do any of the myriad other things necessary to a successful reentry.

## INDIVIDUAL PETITIONERS

18. Each of the individual petitioners has been directly and adversely affected by the failures described above, as follows.

## Other Inmates

33.   Upon information and belief, inmate Mark Watson, register number 56449-066, is serving a 7 month sentence and despite having a projected release date of on or about October 13, 2014, less than 4 months away, he has not been evaluated or referred for CCF placement.  This allegation is made upon information and belief because while this petition was being prepared, he indicated to lead petitioner Zielinski that he wishes to participate in this proceeding, but he has since been moved to another unit with no way to sign this petition.

34.   Upon information and belief, inmate Christopher Houston, register number 52339-037, was removed from Brooklyn House CCF on or about December 27, 2013 due to an allegation of misconduct.  That removal is the subject of a pending petition for a writ of habeas corpus in this Court.  In or around April, 2014 he requested to be placed in a CCF, but was told that he is "too short," meaning there is not enough time left on his sentence for MCC staff to complete a CCF referral.  This allegation is made upon information and belief because although he has indicated to lead petitioner Zielinski that he wishes to participate in this proceeding, he is housed on another unit with no way to sign this petition.

35.   Upon further information and belief, the basis of which is numerous conversations with other inmates, many other inmates have been similarly affected by MCC staff's CCF referral failures and MCC's failure to provide alternative pre-release conditions.


## PRAYER FOR RELIEF

WHEREFORE, petitioners respectfully request that this Court:

A.   Enter an Order directing the respondents to immediately evaluate the

petitioners for CCF placement and, if such placement is determined to be warranted, refer them for it;

B.    Enter an Order directing the respondents to immediately investigate and prepare a report supported by sworn declarations on the current state of MCC's CCF referral duties, including the number of inmates currently within the "final months" of their sentence who have not been evaluated or referred for CCF placement, and the number of inmates who have been evaluated and referred late within the past three years;

C.    Enter an Order directing the respondents to immediately begin providing "practicable" alternative pre-release conditions at MCC for inmates who have not been timely evaluated or referred for CCF placement or are otherwise not likely to be transferred to a CCF before expiration of their sentences;

D.    Enter an Order directing respondent SAMUELS to establish policies and procedures to determine how long an inmate should spend in "pre-release custody" conditions separate and apart from determinations of how long, if any, they should be placed in a CCF; and

E.    Grant such other and further relief as this Court deems just and equitable under the circumstances.


Respectfully submitted,


Date: 5/19/2014

JEREMY ZIELINSKI
Lead Petitioner, Pro Se
Register No. 25835-018
Metropolitan Corr. Center
150 Park Row
New York, NY 10007

Date: 5/19/14

JABAREE PERRY
Petitioner, Pro Se
Register No. 57969-056
Metropolitan Corr. Center
150 Park Row
New York, NY 10007

Date: 5/19/14

MICHAEL NAGELL
Petitioner, Pro Se
Register No. 25969-038
Metropolitan Corr. Center
150 Park Row
New York, NY 10007

Date: 5/19/14

MICHAEL MATERASSO
Petitioner, Pro Se
Register No. 58703-054
Metropolitan Corr. Center
150 Park Row
New York, NY 10007

Date: 5/19/14

DAVID BABENZIEN
Petitioner, Pro Se
Register No. 18656-052
Metropolitan Corr. Center
150 Park Row
New York, NY 10007

<u>VERIFICATION</u>

I, JEREMY ZIELINSKI, hereby declare under penalty of perjury that I have read the foregoing petition and that, as to those matters of which I have personal knowledge, they are true and correct, and as to those matters alleged upon information and belief, I believe them to be true.

Executed on 5/19 , 2014.

JEREMY ZIELINSKI

12

I, JABAREE PERRY, hereby declare under penalty of perjury that I have read the foregoing petition and that, as to those matters of which I have personal knowledge, they are true and correct, and as to those matters alleged upon information and belief, I believe them to be true.

Executed on ___5/19___, 2014.

JABAREE PERRY


I, MICHAEL NAGELL, hereby declare under penalty of perjury that I have read the foregoing petition and that, as to those matters of which I have personal knowledge, they are true and correct, and as to those matters alleged upon information and belief, I believe them to be true.

Executed on ___5/19___, 2014.

MICHAEL NAGELL


I, MICHAEL MATERASSO, hereby declare under penalty of perjury that I have read the foregoing petition and that, as to those matters of which I have personal knowledge, they are true and correct, and as to those matters alleged upon information and belief, I believe them to be true.

Executed on ___5/19___, 2014.

MICHAEL MATERASSO


I, DAVID BABENZIEN, hereby declare under penalty of perjury that I have read the foregoing petition and that, as to those matters of which I have personal knowledge, they are true and correct, and as to those matters alleged upon information and belief, I believe them to be true.

Executed on ___5/19___, 2014.

DAVID BABENZIEN

13

EXHIBIT 1



**U.S. Department of Justice**

Federal Bureau of Prisons

*Washington, D.C. 20534*

**MAY 24 2013**

MEMORANDUM FOR REGIONAL DIRECTORS
                   WARDENS
                   RESIDENTIAL REENTRY MANAGERS

FROM:           Blake R. Davis, Assistant Director
                 Correctional Programs Division

SUBJECT:     Guidance for Home Confinement and Residential
                 Reentry Center Placements

This memorandum is a compilation of previous guidance memoranda, policy, and practices regarding home confinement and Residential Reentry Center (RRC) placement decisions, as they relate to current policy, practice, and changes which were necessitated by the passage of the Second Chance Act of 2007. The intent of this memorandum is to reemphasize and clarify established policies and practices to facilitate effective community placements.

## I. GUIDING PRINCIPLES FOR EFFECTIVE COMMUNITY PLACEMENTS

The Bureau's RRC resources continue to be limited and must be focused on those inmates with the greatest need and the highest risk of recidivism. Program Statement 7310.04, <u>Community Corrections Center Utilization and Transfer Procedures</u>, requires that RRC placements be made based on assessments of inmate needs for services, public safety, and the necessity of the Bureau to manage its inmate population responsibly. The Second Chance Act emphasizes the requirement that all inmates are eligible for pre-release RRC placement consideration and are to be assessed on an individual basis.

An individual inmate assessment is the primary means by which we determine an inmate's need and risk level. Research indicates that inmates with low needs and a low risk of recidivating who are placed in an RRC do not benefit from the placement and could become more likely to recidivate than if they received no placement.

In accordance with the Bureau's mission to ensure public safety, each inmate must be thoroughly evaluated based upon their need for reentry services, as well as perceived risk for recidivism and risk to the community. This was previously outlined in the June 24, 2010, memorandum "Revised Guidance for Residential Reentry Center Placements," and the April 14, 2008, memorandum "Pre-Release Residential Reentry Center Placements following the Second Chance Act of 2007."[1] When contemplating an inmate's appropriateness for community placement, staff should continue to follow current policy and practice and consider public safety while determining an inmate's need for reentry services. This will help determine whether or not receiving reentry services might mitigate those public safety concerns in the long run. For example, some higher risk inmates may initially appear to be inappropriate for referral to an RRC. However, when you thoroughly weigh the potential for increased risk of recidivism of a street release versus release through an RRC, it may in fact be in the best interest of public safety to refer the inmate to the RRC.

Accordingly, every effort should be made to consider community placements for inmates with manageable medical and mental health needs. These placements can help mitigate the potential increased recidivism risk of sending an inmate with these needs directly to the community. A community placement provides more expedient access to resources to address the specialized needs of these populations. Staff must take the steps necessary to facilitate these placements.

For low need/low risk inmates, home confinement is the preferred pre-release option. This option is currently under-utilized. Program Statement 7320.01, Home Confinement, states supervision under home confinement may be provided by contract halfway house services, U.S. Probation or other government agencies.

---

1 See Sallyport, Correctional Programs Division, Correctional Programs Branch, CPB Topics "RRC"

This is normally accomplished via two home confinement options - placement under the supervision of an RRC or placement in the Federal Location Monitoring (FLM) program operated by U.S. Probation, where available. We must make a concerted effort to utilize these effective community placement options for appropriate inmates. In addition to reintegrating inmates more quickly into their communities, maximizing the use of home confinement for appropriate inmates will help mitigate our critical population/capacity issues.

Residential Drug Abuse Program (RDAP) graduates who successfully complete the institution-based portion of the RDAP will continue to be assessed for pre-release RRC placements according to the guidance in P7430.02, Community Transitional Drug Abuse Treatment.

Wardens and Residential Reentry Managers (RRMs) play a vital role in ensuring an effective assessment process for inmates' community placements. This memorandum highlights the major elements of an effective RRC and home confinement utilization strategy.

## II. MAKING AN APPROPRIATE RRC REFERRAL

As clarified in the June 2010 memoranda noted above, the Second Chance Act states that while all inmates are statutorily eligible for pre-release community placement, not all will be appropriate. Inmates must continue to be individually assessed for their appropriateness for and the length of pre-release RRC placements using the following five factors from 18 U.S.C. § 3621(b) and outlined in the April 2008 and June 2010 memoranda:

    (1) The resources of the facility contemplated;
    (2) The nature and circumstances of the offense;
    (3) The history and characteristics of the prisoner;
    (4) Any statement by the court that imposed the sentence:
        (a) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
        (b) recommending a type of penal or correctional facility as appropriate, and
    (5) Any pertinent policy statement issued by the U.S. Sentencing Commission.

When reviewing the above factors, staff should continue to consider the inmate's need for reentry services, public safety

~ 3 ~

concerns, and the need to responsibly manage the Bureau's inmate population.

Staff should also continue to thoroughly assess inmates' individual reentry needs when considering the appropriate duration of an RRC placement as outlined in the above referenced memoranda, current policy, and practice. A placement less than 90 days is typically not considered sufficient to address multiple reentry needs. In many cases, a placement of several months up to the maximum of one year[2] may be needed to accomplish an inmate's reentry goals. For example, an inmate with no recent employment, no GED, and poor family ties would benefit more from a one year placement than an inmate who has a short sentence, employment prospects, a high school diploma, and frequent family contacts. The number of placement days should be driven primarily by the inmate's needs and risk level (as determined by the BP-338 Custody Classification assessment or BP-337 Security Designation assessment if a BP-338 has not been completed).

The BP-338 is the Bureau's primary risk prediction instrument. Ordinarily, the lower the BP-338 score, the lower the inmate's risk; conversely, the higher the score, the higher the inmate's risk. Those with lower risks should be considered for home confinement placement and those with higher risks should be considered for RRC placement.

It is important to note that in many areas, the Bureau continues to have contracting options available to utilize the more secure environment of a Work Release Center (e.g., county jail/detention center) as a community placement. This may be the most appropriate placement option for inmates who may require closer supervision than an RRC. Institution staff should contact the applicable RRM to determine if this option is available in the area where the inmate is releasing for cases that may be deemed inappropriate for a traditional RRC.

If an inmate is truly not suitable for transfer to an RRC prior to release, staff have the option of contacting the USPO to discuss a possible public law placement wherein the judge places the individual in an RRC after their release from Bureau custody as a condition of supervised release.

---

2 See Title 18 U.S.C. § 3624(c)(1).

## III. MAKING AN APPROPRIATE REFERRAL FOR DIRECT HOME CONFINEMENT (PRE-RELEASE)

As outlined in P7320.01, Home Confinement, and per 18 U.S.C. § 3624(c)(1), all inmates are eligible for home confinement consideration at their six-month or 10 percent date. When considering an inmate for pre-release community placement, the unit team should pay special attention to reviewing low and minimum security inmates for possible direct placement on home confinement as allowed under P7320.01, Home Confinement. Higher security inmates may be considered if deemed appropriate following an individual assessment. The basic criteria for home confinement includes:

1) Appropriate release residence (e.g., positive environment free from criminal/drug use activity and a reasonable distance from the RRC, typically less than 100 miles);
2) No recent major disciplinary issues. This should be based on sound correctional judgment;
3) Any medical or mental health needs that can be met in the community and funded by the inmate or other documented resources, and
4) Secured employment is not required for placement on home confinement.

Placement should occur as close to the home confinement eligibility date as possible. The direct home confinement referral is not contingent upon USPO residence approval. A site visit should be requested during the referral process, but should not delay the submission of the referral to the RRM.

As part of their routine duties in processing inmate referrals, RRM staff will determine if placement will be via an RRC contract or FLM. In judicial districts where FLM is available, RRM staff should consider this option for appropriate inmates to the maximum extent possible.

## IV. RRM STAFF REVIEW OF RRC/HOME CONFINEMENT REFERRALS

RRM staff will continue to thoroughly review referral documents and other pertinent information for each community placement referral. RRM staff are encouraged to maximize resources to include recommending direct placement on home confinement for appropriate inmates.

E X H I B I T   2



Federal Bureau of Prisons

Washington, DC 20534

June 24, 2010

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:           D. Scott Dodrill, Assistant Director
                Correctional Programs Division

SUBJECT:        Revised Guidance for Residential Reentry Center
                (RRC) Placements

This memorandum provides guidance to staff when making inmates'
pre-release Residential Reentry Center (RRC) placement decisions.
Assessment and decision-making practices are to focus on RRC
placement as a mechanism to reduce recidivism. Recidivism
reduction results in cost efficiencies, less victimization, and
safer communities.

Our RRC resources are limited and must be focused on those
inmates most likely to benefit from them in terms of anticipated
recidivism reduction. In other words, our decisions are to be
based on an assessment of the inmate's risk of recidivism and our
expectation that RRC placement will reduce that risk. Our
strategy is to focus on inmates who are at higher risk of
recidivating and who have established a record of programming
during incarceration, so that pre-release RRC placements will be
as productive and successful as possible.

As Chief Executive Officers, you play a vital role in
implementing the Bureau of Prisons' (Bureau) reentry strategy,
including RRC utilization. This guidance will assist you in
making RRC placement decisions.

**GENERAL CONCEPTS** - The following general concepts apply to all
RRC placement assessments and decision-making:

**Eligibility vs. Appropriateness** - When making RRC placement
determinations, it is critical that staff understand the
difference between eligibility and appropriateness. All inmates
are statutorily eligible for up to 12 months pre-release RRC

-1-

placement. Nevertheless, not all inmates are appropriate for RRC placement, and for those who are appropriate, the length of the RRC placement must be determined on an individual basis in accordance with this guidance.

**Individual Assessments Required** – Inmates must continue to be individually assessed for their appropriateness for and the length of pre-release RRC placements using the following five factors from 18 U.S.C. § 3621(b):
  (1) The resources of the facility contemplated;
  (2) The nature and circumstances of the offense;
  (3) The history and characteristics of the prisoner;
  (4) Any statement by the court that imposed the sentence:
      (a) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
      (b) recommending a type of penal or correctional facility as appropriate; and
  (5) Any pertinent policy statement issued by the U.S. Sentencing Commission.

These individual assessments occur as part of the inmate classification and program review process, with the unit manager holding decision-making responsibility at the unit level. Institution- or region-specific parameters for RRC placement decision-making are prohibited.

**RRC Placements of More Than Six Months** – Regional Director approval of RRC placements longer than six months is no longer required.

**Residential Drug Abuse Program Graduates** – Inmates who successfully complete the institution-based portion of the Residential Drug Abuse Program (RDAP) will continue to be assessed for pre-release RRC placements according to the guidance in the Psychology Treatment Programs policy.

**Coordination Between Institution Staff and Community Corrections Management Staff** – Community Corrections Management (CCM) staff must continue to review referral documents and other pertinent information for every RRC referral. If CCM staff question the appropriateness of the referral or the length of the requested placement, they must communicate these concerns to the referring institution. Differing recommendations will be resolved at the appropriate level within the regional management structure. Under no circumstances should CCM staff unilaterally deny RRC referrals or adjust placement dates, unless these determinations can be linked directly to a lack of RRC bedspace or fiscal resources.

**Medical and Mental Health Concerns** - When considering RRC placement for inmates with significant medical or mental health conditions, institution staff are strongly encouraged to coordinate release planning with CCM staff and Transitional Drug Abuse Treatment staff (for mental health concerns). If an inmate's condition precludes residential placement in an RRC, and if staff can make appropriate arrangements to secure the community-based medical and/or mental health services these inmates will need, direct placement on home detention should be considered.

**Inmates Who Decline RRC Placement** - If an institution recommends release through a community-based program and the inmate declines, institution staff should counsel the inmate as to the benefits of a structured reentry program. However, if the inmate continues to decline this opportunity, she/he may do so without being subject to disciplinary action.

**Inmates Who are Inappropriate for RRC Placement** - Inmates who, during incarceration, have refused programming or failed to engage in activities that prepare them for reentry may be inappropriate for RRC placement. Similarly, inmates with recent, serious, or chronic misconduct and those who have previously failed an RRC program may be inappropriate.

RRCs provide opportunities for inmates to acquire the support systems, e.g., residence, employment, follow-up treatment, they will need to live a crime-free life, but inmates must be ready to take advantage of these opportunities. If they have clearly demonstrated through their behavior that they are not ready, RRC programming is unlikely to result in behavioral change and would be a waste of the Bureau's resources, as well as place the public at undue risk.

Professional judgment must be exercised, insofar as inmates with some misconduct, or some refusal to participate in programming, may still be appropriate for RRC placement. Staff must exercise their discretion in determining whether an inmate is ready to take advantage of the opportunities and expanded liberty that RRCs offer.

If staff decide not to refer an inmate for RRC placement, the inmate's release should be carefully coordinated with U.S. Probation or Court Services and Offender Supervision Agency (DC Code inmates).

**Professional Judgment** – RRC placement, in and of itself, is not a reward for good institutional behavior, nor is it an early release program or a substitute for the furlough program. RRC placement and length of placement decisions cannot be reduced solely to a classification score or any other type of arbitrary categorization. While staff assessment and analysis of tools such as the Custody Classification Form (BP-338) and the Inmate Skills Development (ISD) Plan are helpful in establishing broad-based groupings, staff must continue to exercise their professional judgment when making individual inmate RRC placement decisions and be prepared to justify those decisions.

## LENGTH OF RRC PLACEMENT

### General Guidelines

- **Prospective Application** – Inmates with previously established RRC transfer dates will not be reconsidered under this guidance.

- **90 Days Minimum Placement** – With the exception noted below under the heading of Lower-Risk Inmates, inmates should be considered for at least 90 days pre-release RRC placement whenever possible.

- **High-Risk Versus Low-Risk Inmates** – RRCs are most effective, in terms of recidivism reduction, for inmates at higher risk for recidivism. Consequently, appropriate higher-risk inmates should be considered for longer RRC placements than lower-risk inmates. The BP-338 measures some of the factors that predict risk. Ordinarily, the lower the BP-338 score, the lower the risk; conversely, the higher the score, the higher the risk. Therefore, low-, medium-, and high-security inmates tend to be higher risk than minimum-security inmates.

  Similarly, the ISD tool identifies deficits that may contribute to recidivism. Inmates with a significant number of deficits may be at higher risk for recidivism than those with few or no deficits. When making RRC placement decisions, staff should ensure that the BP-338 and ISD Assessment have been accurately completed. While neither tool can be relied upon solely, they are helpful tools in assessing an inmate's risk level.

as any of the cognitive/behavioral treatment programs described in the Psychology Treatment Programs Program Statement, as well as academic and vocational training programs.

- **Inmate's Community Support Systems** – Assess the inmate's available community support systems, e.g., housing, employment, etc.

- **Length of RRC Placement** – Longer RRC placements should be considered for inmates whose following factors are high:

  > Risk for recidivism;
  > Demonstrated successful participation in or completion of programming opportunities; and
  > Need to establish community support systems.

Your assistance in implementing these procedures is appreciated. I look forward to working with you as we seek to effectively utilize the Bureau's limited RRC resources.

E X H I B I T   3

U.S. Department of Justice

Federal Bureau of Prisons

Washtngton, D.C. 20534

November 14, 2008

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

/s/ Kathleen M. Kenney

FROM: Kathleen M. Kenney

Assistant Director/General Counsel

/s/ Joyce K. Conley

Joyce K. Conley, Assistant Director

Correctional Programs Division

SUBJECT: Inmate Requests for Transfer to residential Reentry Centers

This memorandum provides guidance to Bureau of Prisons (Bureau) staff for considering and responding to inmate requests for transfer to Residential Reentry Centers (RRCs), when more than 12-months remain from their projected release date.1 Questions regarding this guidance should be directed to the Correctional Programs Branch, and/or your Regional Counsel or Consolidated Legal Center.

Individualized Consideration Required

Inmates are legally eligible to be placed in an RRC at any time during their prison sentence. Federal Courts have made clear that RRCs are penal or correctional facilities within the meaning of the applicable statutes. Staff cannot, therefore, automatically deny an inmate's request for transfer to a RRC. Rather, inmate requests for RRC placement must receive individualized consideration. In other words, staff cannot say that an inmate, whatever the circumstances, is automatically ineligible for transfer to a RRC. Rather, staff must first review the inmate's request on its individual merits, in accordance with policy, and as explained in this guidance.

Timing of Reviews

If an inmate requests transfer to an RRC prior to the pre-release time frame of 12-months from release, staff must individually consider the request, just as they would any other request for lower security transfer. There is no need, however, to immediately perform the individualized review at the moment it is submitted. Rather, the inmate should be informed that his/her request will be fully reviewed in conjunction with the next scheduled Program Review.2

When informing inmates of the timing for review of transfer requests, it is vitally important that staff not inform the inmate (either orally or in writing) that he/she is ineligible for transfer to a RRC. Telling an inmate that he/she is ineligible for RRC placement is the same as automatically denying the inmate from even being considered for such placement, and is not in accord with Bureau policy.

Designation Review Factors and Policy

At the scheduled Program Review meeting where the inmate's RRC transfer request is considered, staff should review:

© 2014 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25836018

(1) the resources of the facility contemplated;(2) the nature and circumstances of the offense;(3) the history and characteristics of the prisoner;(4) any statement by the court that imposed the sentence-

(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or(B) recommending a type of penal or correctional facility as appropriate; and(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.These "five factors" are the foundation of Bureau Program Statement No. 5100.08, Inmate Security Designation and Custody Classification. That policy instructs that "[e]ach inmate will be placed in a facility commensurate with their security and program needs through an objective and consistent system of classification which also allows staff to exercise their professional judgement."

Staff should also consider the resources of available RRCs, which are procured by the Bureau primarily to assist inmates in reintegrating into the community during the last 12-months of the prison sentence. As stated in Bureau Program Statement No. 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedures,3 RRCs provide a "transitional environment for inmates nearing the end of their sentences." The level of structure and supervision available at these facilities is designed to assure accountability, provide program opportunities in employment counseling and placement, substance abuse, and aid inmates in acquiring daily life skills so as to successfully reintegrate into the community at large. An RRC placement beyond six months should only occur when there are unusual or extraordinary circumstances justifying such placement, and the Regional Director concurs.

Inform the Inmate of the Decision

If staff determine, in the exercise of their professional judgement and after individualized review, that the inmate's current designation is commensurate with his/her security and programming needs, the inmate will be informed that the current designation is appropriate, and that the transfer request is denied. The inmate can further be specifically informed, based on that assessment, that a requested transfer to an RRC is inappropriate.

If staff determine the inmate is appropriate for a RRC transfer, the unit team should request a transfer pursuant to the April 14, 2008 guidance. As indicated therein, RRC transfers for more than the last six months of the inmate's prison sentence require the Regional Director's concurrence.

Attachment

© 2014 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

25835013

E X H I B I T   4

--------------------------------------------------------------------------------

FROM: Unit Team 5/7
TO: 58703054
SUBJECT: RE:***Inmate to Staff Message***
DATE: 04/07/2014 10:27:02 AM

You will be teamed by 4-22-14. At that time, we will have a formal meeting and address your release needs.

>>> ~^!"MATERASSO, ~^!MICHAEL" <58703054@inmatemessage.com> 4/7/2014 10:52 AM >>>
To: 5-SOUTH
Inmate Work Assignment: Kitchen

Michael Materasso # 58703054

Mr. Byrd,

    I am currently formally requesting for placement in Halfway house pursuant to STATUTORY AUTHORITY. 18 U.S.C. 3624 (C).
Which states:

" The Bureau of Prison shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last ten per centum of the term to be served under conditions the will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's reentry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation Office shall, to extent practicable, offer assistance to a prisoner during such pre-release custody."

When we last spoke on April 2, 2014 you indicated that due to my multiple violations and reoccurring B.O.P exposure that you or your supervisor couldn't find just cause to process my paper work for placement in the halfway house. It should be noted that in my prior exposure to the halfway house I successfully completed both a five (5) and a four (4) month term.
I believe that due to my need for re entry preparations I can benefit from halfway house placement to ease my reentry and quick employment attaining transition.
I would also like to note that your reasoning for denying and affording me my right to halfway is in clear violation of the Bureau of Prisons STATUTORY AUTHORITY. 18 U.S.C. 3624 (c).
Your response to this matter is appreciated.

Michael Materasso
58703054

# FURLOUGH APPLICATION - APPROVAL AND RECORD CDFRM

**U.S. DEPARTMENT OF JUST** ⁙       ʜEDERAL BUREAU OF PRISONS

| Inmate's Name | Register No. | Institution (address and phone number) |
|---|---|---|
| Zielinski, Jeremy | 25835-018 | MCC - New York<br>150 Park Row - 5 South<br>New York, NY 10007<br>(646) 836-6300 |

## APPLICATION

| Purpose of Visit<br>RRC Placement | SENTRY Assignment<br>FURL TRANS | Date/Time of Departure<br>04-18-2014 @ 10:00 am | Date/Time of Return<br>Inmate will not return t<br>MCC New York |
|---|---|---|---|

Furlough Address (include name of responsible party if applicable):
Horizon Center 35-37 Elizabeth Street, Albany, NY 12202      CPG   EB3

Telephone No. (Including Area Code):   (518) 432-8700

| Point of Contact for Emergency<br>MCC New York - New York | Method of Transportation<br>Mass Transportation<br>Grey Hound<br>Taxi | Detainer/Pending Charges<br>No | Verified by (CSM Staff)<br>✓ Yes    No |
|---|---|---|---|

NOTE TO APPLICANT: You are reminded that should any unusual circumstances arise during the period of your visit, you should notify the institution immediately at telephone: (646) 836-6300

## UNDERSTANDING

I understand that if approved, I am authorized to be only in the area of the destination shown above and at ordinary stopovers or points on a direct route to or from that destination. I understand that my furlough only extends the limits of my confinement and that I remain within the extended limits of this confinement. If I fail to remain within the extended limits of this confinement, it shall be deemed as escape from the custody of the Attorney General, punishable as provided in Section 751 of Title 18, United States Code. I understand that I may be thoroughly searched upon my return to the institution and that I will be held responsible for any item of contraband or illicit material that is found. I have read or had read to me, and I understand that the foregoing conditions govern my furlough, and will abide by them. I have read or had read to me, and I understand the CONDITIONS OF FURLOUGH as set forth on the reverse of this form.

| Witness<br>Case Manager<br>Title | Signature of Applicant<br>3/31/14<br>Date Signed |
|---|---|

## ADMINISTRATIVE ACTION

| Information Verified by: O. Flores | Title: Case Manager |
|---|---|
| Name Of USPO Notified: N/A | Date of Notification: N/A |

Does USPO Have Any Objections to Furlough? (If so, explain)
RRC Placement

## APPROVAL

| Approval for the above named Inmate to leave the Institution on a furlough as outlined is hereby granted in accordance with P.L. 93-209 and the BOP Furlough Program Statement. The period of furlough I from:<br><br>04-18-2014 at 10:00 am to 04-18-2014 at 3:00 pm | As CMC, I have reviewed the Request for Activity Clearance (404) and the SENTRY CIM Clearance and Separatee Data and I recommend the inmate be approved to participate in this furlough.<br><br>✓ Yes ___ No Signature of CMC |
|---|---|

Chief Executive Officer (Name & Date) - Approval and signature certifies CIMS Clearance
✓ Approval
  Disapproval    Catherine L. Linaweaver, WARDEN     4/3/14

## RECORD

| Date/Time Released: _____ | Date/Time Returned: _____ |
|---|---|

Travel Schedule: Inmate Zielinski will depart MCC New York at 10:00 AM on April 18, 2014 via NYC Mass Transit en route to NYC Port Authority arriving no later than 10:30 AM. He will depart via Greyhound Bus at 11:20 AM, en route to the Albany, NY Greyhound bus station arriving no later than 2:20 PM. At 2:20 PM inmate Zielinski will depart Greyhound Bus Station via taxi to arrive at Horizon Center 35-37 Elizabeth Street, Albany, NY 12202 no later than 3:00 PM.