UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14CV3798

- - - - - - - - - - - - - - -)
                              )
JEREMY ZIELINSKI, et al.,     )
              Petitioners,    )
                              )
      v.                      )      Case No._____
                              )
CATHERINE C. LINAWEAVER, et al., )
              Respondents.    )
                              )
- - - - - - - - - - - - - - -)

MAY 2 1 2014

PRO SE OFFICE

PETITIONERS'
MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION

## Table of Contents

Table of Contents ............................................................ i

Table of Authorities ......................................................... ii

Preliminary Statement ........................................................ 1

POINT I: Failure to exhaust administrative remedies should be excused ... 2

POINT II: Petitioners are entitled to a preliminary injunction ... 3

   A.  Petitioners have shown irreparable harm ... 3

   B.  Petitioners are likely to succeed on the merits ... 4

      1.  Governing statutes ... 5

      2.  Respondents have violated petitioners' statutory right to timely CCF consideration and, if warranted, referral ... 6

      3.  Respondents have violated petitioners' statutory right to practicable pre-release conditions whatever the institution of pre-release confinement ... 7

         a.  The BOP has a duty to provide practicable pre-release conditions whatever the institution of pre-release confinement ... 7

         b.  The conditions at MCC do not provide "a reasonable opportunity to adjust to and prepare for ... reentry ... into the community" ... 9

         c.  It is "practicable" for MCC to provide conditions that afford "a reasonable opportunity to adjust to and prepare for ... reentry ... into the community" ... 12

            Increased telephone access ... 13

            Increased community access ... 14

            Assistance preparing important papers ... 15

            Cooperation with local agencies and services ... 16

            Other options ... 16

         d.  The balance of hardships tips decidedly in petitioners' favor ... 17

Conclusion ... 18

Wilson v. Seiter,
    501 U.S. 294 (1991)                                           11

## Other Authorities

Black's Law Dictionary (6th Ed. 1990)                           9–10

Black's Law Dictionary (9th Ed. 2009)                             12

BOP Program Statement 5280.09                                  14–15

BOP Program Statement 7310.04                                     15

Legislative Memorandum in Support of NY L.2007, c. 240, § 3       13

Michelle A. Powell, Report on Workforce Development Initiatives in
    the Eastern District of New York (2011)                       16

Webster's New International Dictionary (3d Ed. 2002)              12

## Preliminary Statement

Incarceration is one of the most disruptive forces a civil society can inflict on its members. When a man or woman is imprisoned, his or her personal, social, economic, and physical connections to the rest of society are irrevocably altered and, in many cases, destroyed. While there are of course legitimate and lawful reasons for imprisonment, no enlightened, scientific society should be surprised that if a person is stripped of all his possessions and resources and locked away for a long period of time, then suddenly dumped on the street to fend for himself, a return to crime is sometimes the result.

When Congress recognized society's compelling interest in successful reintegration by enacting the Second Chance Act, it explicitly stated that its goal is community safety through the reduction of recidivism. To that end, it directed the BOP to provide inmates who are nearing the end of their sentences with conditions that facilitate, rather than hinder, their successful reentry as law-abiding citizens, including but not limited to by placing them in community correctional facilities ("CCF's") for up to one year before their release. And in plain language, it directed that pre-release conditions are to be afforded regardless of an inmate's pre-release location.

MCC has defaulted on these obligations by systemically failing to timely review inmates for CCF placement and taking what amounts to a "CCF or nothing" approach. As a result, petitioners and other inmates at MCC have been and continue to be deprived of pre-release conditions. This petition seeks to remedy these failures. This motion seeks a preliminary injunction to compel the respondents to begin taking steps to effect, rather than defy, the plainly-expressed will of Congress.

POINT I

## Failure to exhaust administrative remedies should be excused

Federal prisoners ordinarily must exhaust administrative remedies using the BOP's Administrative Remedy Program, see 28 C.F.R. Part 542, before seeking habeas or mandamus relief. Carmona v. Fed. Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001). However, the exhaustion requirement in this context is "prudential, not statutory." Pimentel v. Gonzales, 367 F.Supp.2d 365, 371 (E.D.N.Y. 2005). Exhaustion may be excused when "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." Beharry v. Ashcroft, 329 F.3d 51, 62 (2d Cir. 2003)(quotation marks omitted).

Courts in this Circuit have consistently excused failure to exhaust in petitions challenging failures by the BOP to evaluate or designate inmates to CCF's or provide alternative prerelease conditions. See e.g., Sorbello v. Laird, No. 06-CV-948, 2007 U.S. Dist. LEXIS 13624 n.8 (E.D.N.Y. Feb. 28, 2007) (late designation to CCF constitutes irreparable harm and exhaustion would be futile); Fournier v. Zickefoose, 620 F.Supp.2d 313, 317 (D.Conn. 2009)(agreeing with petitioner "seeking immediate transfer to a RRC or home confinement" that BOP remedies take so long that they provide "no genuine opportunity for adequate relief," and would be futile because of "the obvious urgency of her Application and the near certainty that forcing her to pursue administrative remedies will render this case moot").

Most of the petitioners here are well overdue for CCF referrals and thus satisfy the irreparable injury requirement. Others have been told there is "not enough time" to process their overdue papers or that "no bed space" is

2

available, plainly satisfying the "no genuine opportunity for adequate relief" and futility requirements. Petitioners' non-exhaustion should therefore be excused.


POINT II

Petitioners are entitled to a preliminary injunction

To redress MCC's systemic failures, petitioners seek a preliminary injunction compelling respondents to (1) immediately evaluate petitioners for CCF placement and, if such placement is determined to be warranted, refer them for it expeditiously; (2) immediately investigate the scope, scale, and reasons of MCC's failures to timely process CCF evaluations and referrals; and (3) immediately evaluate the practicability of providing petitioners and other MCC inmates overdue for CCF referrals with alternative pre-release conditions as an interim solution.

To be entitled to a preliminary injunction, a party must establish "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of hardships tipping decidedly in favor of the moving party." City of N.Y. v. Golden Feather Smoke Shop, Inc., 597 F.3d 115, 120 (2d Cir. 2010).


A.   Petitioners have shown irreparable harm

Where a party shows a likelihood that a statute which implements Congressional policy is being violated to the detriment of the public, then irreparable harm is presumed. U.S. v. Diapulse Corp. of America, 457 F.2d 25, 27-28 (2d Cir. 1972)("the function of a court in deciding whether to issue an injunction ... to enforce and implement Congressional policy is a different one

from that of the court when weighing claims of two private litigants.").
"[W]hen a statute contains, either explicitly or implicitly, a finding that
violations will harm the public, the courts may grant preliminary equitable
relief on a showing of a statutory violation without requiring any additional
showing of irreparable harm." Gov't of Virgin Islands v. Virgin Islands Paving,
Inc., 714 F.2d 283, 286 (3d Cir. 1983).

As discussed above in the exhaustion discussion, late designation to a CCF
has already been held to constitute irreparable harm. Sorbello, 2007 U.S. Dist.
LEXIS 13624 at n.8. More generally, the Second Chance Act was passed in light
of overwhelming evidence that successful reintegrations are in the public
interest. See 42 U.S.C. § 17501 (Congressional findings and purpose); U.S. v.
Bannister, 786 F.Supp.2d 617, 653-62 (E.D.N.Y. 2011)(Weinstein, J.)(discussing
the far-reaching public harms from incarceration and reintegration failures);
Prows v. Fed. Bureau of Prisons, 981 F.2d 466, 469 (10th Cir. 1992)(18 U.S.C.
§ 3642(c) is "a legislative directive focusing on the development of conditions
that facilitate the inmate's adjustment to free society, whatever the
institution of pre-release confinement."). "The passage of the [Second Chance
Act] is, in a sense, an implied finding that violations will harm the public
and ought, if necessary, be restrained." Diapulse, 457 F.2d at 28 (citing
U.S. v. City and County of San Francisco, 310 U.S. 16 (1940)). The petitioners
have therefore shown irreparable harm.


B.   Petitioners are likely to succeed on the merits
To demonstrate a likelihood of success on the merits, a party "need not
show that success is an absolute certainty. He need only make a showing that
the probability of prevailing is better than fifty percent. There may remain
considerable room for doubt." Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d

Cir. 1985). Thus, petitioners need only show that they have a "better than fifty percent" chance that they are "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3); or that they are entitled to mandamus relief, that is:

> (1) that there is a clear legal right to the relief sought; (2) the Government has a plainly defined and peremptory duty to perform the act in question; and (3) there is no other adequate remedy available.

Benzman v. Whitman, 523 F.3d 119, 132-33 (2d Cir. 2008). Petitioners will succeed on both.


1.   Governing statutes

Under 18 U.S.C. § 3621(b), the BOP has general authority to designate the place of an inmate's imprisonment. 18 U.S.C. § 3624(c) addresses the BOP's duty to prepare inmates for reentry by, inter alia, placing them in CCF's. In relevant part, it commands:

> The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

18 U.S.C. § 3624(c)(1).

When Congress enacted the Second Chance Act, it directed the BOP to issue regulations "which shall ensure that placement in a community correctional facility by the Bureau of Prisons is--(A) conducted in a manner consistent with [18 U.S.C. § 3621(b)]; (B) determined on an individual basis; and (C) of sufficient duration to provide the greatest likelihood of successful reintegration into the community." 18 U.S.C. § 3624(c)(6). Section 3621(b) provides that the BOP "shall designate the place of the prisoner's imprisonment." It sets out five factors that the BOP must consider when

determining whether and how long to place a prisoner in a CCF:

> (1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence--(A) concerning the purposes for which the sentence was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate; and (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a) of title 28.

18 U.S.C. § 3621(b)(1)-(5).

The BOP subsequently enacted regulations at 28 C.F.R. §§ 570.20 - 570.22.[1]

570.20 defines terms; 570.21, entitled "Time-frames," authorizes designation

to a CCF for the final months of an inmate's sentence; and 570.22 parrots the

statutory language of § 3624(c)(6):

> Inmates will be considered for pre-release community confinement in a manner consistent with 18 U.S.C. § 3621(b), determined on an individual basis, and of sufficient duration to provide the greatest likelihood of successful reintegration into the community, within the time-frames set forth in this part.

28 C.F.R. § 570.22 (Oct. 21, 2008).


> 2. Respondents have violated petitioners' statutory right to timely CCF consideration and, if warranted, referral

That petitioners are likely to succeed on the merits of their claims that

MCC's flagrant failure to process CCF evaluations and referrals violates their

rights under § 3624(c) could hardly be more obvious. "Congress intended that

each inmate would be considered for the longest duration - 12 months - although

the ultimate placement may be less than 12 months, if warranted by application

of the § 3621(b) factors". Strong v. Schultz, 599 F.Supp.2d 556, 562 (D.N.J.

2009). "Obviously, an underlying premise of these [Second Chance Act]

amendments is that the more time an inmate spends in a CCC before he or she

---

1. Whether 570.20-570.22 comply with § 3624(c)(6) is at issue in this petition but not on this motion for a preliminary injunction.

is released from BOP custody, the more likely it is that his or her community reintegration will be successful." Id. It is, of course, axiomatic that an inmate must be evaluated for a CCF before he can actually be placed in a CCF, for any duration. If it violates § 3624(c)(1) for the BOP to evaluate an inmate pursuant to a policy which unlawfully limits discretion as to how long to place inmates in CCF's, then, a fortiori, a wholesale failure to evaluate them at all by not bothering to do necessary paperwork violates the statute as well. Petitioners will succeed on this claim.

3.   Respondents have violated petitioners' statutory right to
     practicable pre-release conditions whatever the institution of
     pre-release confinement

Regardless of whether inmates are transferred to CCF's, the BOP has a duty to provide "practicable" pre-release conditions, that is, "conditions that will afford ... a reasonable opportunity to adjust to and prepare for ... reentry ... into the community." 18 U.S.C. § 3624(c)(1). This is a facility-neutral obligation, and the present conditions at MCC fall far short, even though there are numerous "practicable" alternatives available.

a.   The BOP has a duty to provide practicable pre-release
     conditions whatever the institution of pre-release confinement

Litigation in recent years surrounding § 3624(c) has focused on whether the BOP properly considered an inmate for placement in a CCF. Although the BOP's discretion in this area must be exercised in compliance with Congress' directives, it nevertheless "retains discretion under the Second Chance Act to decide whether and when an inmate should be placed at [a CCF]." Fournier, 620 F.Supp.2d at 318. See also Levine v. Apker, 455 F.3d 71, 82 (2d Cir. 2005) ("the BOP may place a prisoner where it wishes, so long as it considers the factors enumerated in § 3621."); U.S. v. Williams, 65 F.3d 301, 307 (2d Cir.

1995)(the Court "has no authority to order that a convicted defendant be confined in a particular facility").

However, placement in a CCF is only one side of the coin. A straightforward reading of § 3624(c)(1)'s plain language shows that the BOP has a duty to provide pre-release conditions regardless of an inmate's pre-release location. "The [BOP] shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under [pre-release conditions]. Such conditions may include a community correctional facility." 18 U.S.C. § 3624(c)(1)(emphasis added). "Inmates may be designated to community confinement as a condition of pre-release custody and programming during the final months of the inmate's term of imprisonment, not to exceed twelve months." 28 C.F.R. § 570.21(a) (emphasis added).

Following the well-settled rule of statutory construction that courts are to "give effect to every clause and word of a statute, if possible," U.S. v. Banki, 660 F.3d 665, 676 (2d Cir. 2011), this Circuit has recognized that "the fact that the statute differentiates between the use of 'may' and 'shall' in adjacent sentences indicates the drafters' mindfulness of the significance of those terms." Levine, 455 F.3d at 80-81 (citing Lopez v. Davis, 531 U.S. 230, 240-41 (2001)). Hence, "§ 3624(c) impose[s] an affirmative, discretionless obligation on the BOP, where practicable," to provide pre-release conditions regardless of pre-release location "during a transitional period prior to final release." Id. at 75 (emphasis in original). While § 3624(c) "does not mandate placement in a CCC prior to release, ... the BOP must ensure placement under pre-release conditions except where no such placement is practicable." Goldings v. Winn, 383 F.3d 17, 23 (1st Cir. 2004)(emphasis in original). CCF or not, the BOP has "a broader obligation to provide at least some pre-release

treatment conducive to successful re-entry into the community, whatever the facility of incarceration." Prows, 981 F.2d at 469.

        b.    The conditions at MCC do not provide "a reasonable opportunity to adjust to and prepare for ... reentry ... into the community"

18 U.S.C. § 3624(c)(1) does not define what a "reasonable opportunity to adjust to and prepare for ... reentry ... into the community" is, so we turn to statutory construction. "Where Congress provides no definition for a term in a statute, we 'consider the ordinary, common sense meaning of the words.'" U.S. v. DiCristina, 726 F.3d 92, 97 (2d Cir. 2013)(quoting U.S. v. Dauray, 215 F.3d 257, 260 (2d Cir. 2000)). And the Court's "obligation is to give effect to congressional purpose so long as the congressional language does not itself bar that result." Id. (quoting Johnson v. U.S., 529 U.S. 694, 710 n.10 (2000)).

"To 'adjust' means to change, usually to bring something from the current to a more satisfactory state." Adams v. Holder, 692 F.3d 91, 97 (2d Cir. 2012) (citing definition of "adjust" in Webster's Third New Int'l Dictionary 27 (1986) as "to bring to a more satisfactory state" and "to change the position of"). To "prepare" means "To make ready beforehand for a specific purpose, as for an event or occasion: The teacher prepared the students for the exams." Adams v. Nat'l Eng'g Serv. Corp., 620 F.Supp.2d 319, 329 (D. Conn. 2009)(quoting American Heritage Dictionary of the English Language (4th Ed. 2000)). "Opportunity" means "a combination of circumstances, time, and place suitable or favorable for a particular activity or action." Mont. Wilderness Ass'n v. McAllister, 666 F.3d 549, 556 (9th Cir. 2011)(quoting Webster's Third New Int'l Dictionary 2170 (2002)). And Black's Law Dictionary defines "reasonable" as "Fair, proper, just, moderate, suitable under the circumstances; Fit and

appropriate to the end in view."  Black's Law Dictionary 1265 (6th Ed. 1990).

"Reentry" is not defined in this context in any dictionary, but it is certainly much more than the event of being released from incarceration. "Reentry" is more appropriately thought of as the full spectrum of personal, social, and situational changes a person does, and must, go through once he or she makes the conscious choice to abstain from criminal behavior and commits to living a positive, productive, law-abiding life.

Taken together then, § 3624(c)(1) imposes on the BOP a duty to provide inmates nearing the end of their sentences conditions of confinement which are substantively different from ordinary prison conditions, to the end of ensuring that, before their release, they secure the essentials of reentering and living a law-abiding life in the community.  By definition, "pre-release" conditions are not, and cannot be, the same as ordinary prison conditions.  And common sense suggests that to best "facilitate the inmate's adjustment to free society," Prows, 981 F.2d at 469, pre-release conditions must be noticeably and qualitatively more like the free world than prison.

While the BOP has discretion to determine how best to comply with the facility-neutral command of § 3624(c)(1), the reasons it gives for placing inmates in CCF's, and the Second Chance Act itself, strongly suggest that a "reasonable opportunity to adjust to and prepare for ... reentry" requires that inmates be able to strengthen family ties, seek and secure employment, accrue release funds, secure a residence, and improve their education.  See 42 U.S.C. § 17501(b)(7) ("Released prisoners cite family support as the most important factor in helping them stay out of prison."); (b)(9) ("between 15 percent and 27 percent of prisoners expect to go to homeless shelters upon release from prison"); (b)(17) (there is "growing evidence [that] educational programming while incarcerated reduces recidivism"); Bannister, 786 F.Supp.2d

at 637-38 (costs of joblessness); id. at 661 ("Employment is a crucial antidote for recidivism."). At the very least, the BOP must take steps to ensure that an inmate's release will not cause the deprivation of his or her "basic human needs -- e.g. food, clothing, shelter, medical care, and reasonable safety." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2003)(per curiam)(quoting Helling v. McKinney, 509 U.S. 25, 32 (1993)).[2]

The Court does not need to resolve the full scope of the BOP's duties under § 3624(c)(1) here, because under any plausible construction, MCC fails far short of providing conditions that afford "a reasonable opportunity to adjust to and prepare for ... reentry." Petitioners and others at MCC in the "final months" of their sentences are confined under the exact same highly-restrictive conditions as pretrial detainees, in some cases on the same units. Inmates who should be in "pre-release" conditions instead have not the slightest hint of greater community access or connectivity. Notably, courts in this Circuit have held that the conditions at MCC are so harsh and unduly restrictive that they warrant significant downward departures. See, e.g., U.S. v. Behr, No. S1 03 Cr. 1115-02 (RWS), 2006 U.S. Dist. LEXIS 38349 (S.D.N.Y. JUne 14, 2006) (departing from 37-46 month range to 29 months based on conditions at MCC).

---

2.   While the "basic human needs" doctrine comes from Eighth Amendment prison conditions jurisprudence, it is instructive here.  Given the right case -- say, an inmate being released with no money, no job, no home, and no family -- the Eighth Amendment might well be violated by a refusal to provide transitional assistance before release.  There can be no serious doubt that sentencing a person to the life of a homeless, destitute beggar would be obviously unconstitutional.  If prison officials' deliberate inaction or obstruction leads to the same result, an Eighth Amendment claim might be stated.  It certainly is plausible that the combination of the end of a sentence, destitution, and official obstruction before release could "have a mutually enforcing effect that produces a deprivation of a single, identifiable human need," Wilson v. Seiter, 501 U.S. 294, 304 (1991), and that the risk of that deprivation would be "obvious or otherwise ... known" to officials, Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003), thus violating the Eighth Amendment. This Court, of course, need not resolve such a hypothetical case here.

c. It is "practicable" for MCC to provide conditions that afford "a reasonable opportunity to adjust to and prepare for ... reentry ... into the community"

MCC's failure to provide pre-release conditions would not violate § 3624(c)(1) if it was not "practicable" to provide them. "The [BOP] shall, to the extent practicable, [provide pre-release conditions]." 18 U.S.C. § 3624(c)(1) (emphasis added). This exception, however, is narrow. "An exception to a general statement of policy is usually read narrowly in order to preserve the primary operation of the provision." Maracich v. Spears, 570 U.S. ___, 131 S.Ct. 2191, 2200 (2013)(omission, quotation, and internal quotation marks omitted). And the ordinary meaning of the word discloses it is a narrow exception to begin with. As one court put it:

The Court takes judicial notice of the difference in meaning between the words "practicable" and "practical." According to the American Heritage Dictionary, "Practicable describes that which can be put into effect. Practical describes that which is also sensible and worthwhile. [For example,] it might be practicable to transport children to school by balloon, but it would not be practical." American Heritage Dictionary (2d ed. 1982) at 972 (emphasis in original).

Kingdom 5-KR-41, Ltd. v. Star Cruises PLC, No. 01 Civ. 2946, 2002 U.S. Dist. LEXIS 4636 n.11 (S.D.N.Y. March 20, 2002)(modification in Star Cruises). Cf. the plain meaning of "impracticable" as "not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible." Webster's New Int'l Dictionary 1136 (3d Ed. 2002); Black's Law Dictionary 825 (9th Ed. 2009)(defining "impracticability" as "A fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty.").

With this standard in mind, it is easy to see that MCC has a wide variety of "practicable" options to provide pre-release conditions.

## Increased telephone access

One step that MCC can take immediately, with no effort and at no expense, is to eliminate its present arbitrary restrictions on inmate telephone use. The units most relevant to this petition, 5 North and 5 South, each with approximately 100 inmates,[3] have respectively 3 and 4 telephones. But for no apparent reason, on 5 North only two are on during the day, and on 5 South only one is on; the rest are turned off until evening. Predictably, it is difficult to impossible to get to a telephone during the daytime, and there are long lines in the evening because of the compressed accessibility. These restrictions are unnecessary to any legitimate penological purpose, and in fact they do not apply on weekends or holidays. Also, inmates are restricted to 300 minutes per month of telephone use, which is not enough for inmates to make even one full 15-minute call per day. This restriction also seems to be unnecessary, because in November and December it increases to 400 minutes.

Thus, it is patently obvious that it is "practicable" for MCC to not turn off the phones during the day and to increase the number of calling minutes to at least 400. Indeed, a little elementary math shows that given the number of inmates each phone has to support, the number of minutes could be increased well beyond 400 without overtaxing the system. The New York Legislature has found that inmate telephone access is "critical" to a successful reentry because inmates are often incarcerated far from home, making visitation difficult, and telephones are thus the only way for inmates to stay connected to family and other positive members of the community. See Legislative Memorandum in Support of NY L.2007, c. 240, § 3, enacting NY Corr. L. § 623 (requiring state prisons to procure telephone contracts by competitive bidding and to select providers

---

3. 5 South holds only sentenced inmates; 5 North also houses pretrial detainees.

based on the lowest cost to telephone users). This step would undoubtedly be "conducive to successful reentry," Prows, 981 F.2d at 469, as it would significantly increase inmates' ability to maintain family and community ties. See also 42 U.S.C. § 17501(b)(7) (Congressional finding that "[r]eleased prisoners cite family support as the most important factor in helping them stay out of prison.").[4]

### Increased community access

For inmates to seek and obtain employment, accrue release funds, and secure a residence before their release, they obviously need some level of community access. MCC has the capacity and resources to provide it, and in fact does provide it -- when it serves its own interest to do so. A number of inmates have "gate passes" which allow them to perform inmate job assignments outside facility gates, including warehouse positions pulling items from a BOP warehouse in Brooklyn, positions maintaining the facility, and the "town driver" position driving officers between MCC and other locations around New York City.

There is no reason MCC cannot make similar use of its expertise to allow pre-release inmates to travel to locations in the local area for reentry preparation, and it has specific authority to do so. 28 C.F.R. §§ 570.33(c) through (e) authorize furloughs "for 30 calendar days or less" for inmates to "[p]articipate in the development of release plans;" "[e]stablish or reestablish family and community ties;" and "[p]articipate in selected educational, social, civic, and religious activities which will facilitate release transition;" and BOP Program Statement 5280.09, "Inmate Furloughs,"

---

4. As a brief aside, non-local calls cost $1.50 to connect plus $0.23 per minute, several times higher than market rates. This Court should explicitly encourage Congress to enact legislation similar to NY Corr. L. § 623 to address these extortionate rates. The record in Byrd v. Goord, S.D.N.Y. No. 00-CV-2135 (GBD), provides ample support for such encouragement.

§ 8(a)(11) and (a)(12) authorize "the Warden and supervising agency in the local district [to] initiate a cooperative agreement to use a blanket approval letter for all (or specific types) of [sic] furloughs" and the Warden to secure approval for "multiple furloughs ... over an extended period or on a recurring basis," for up to one year with a single approval, for "inmates participating in a training, educational, or work program in the community."

Also, Program Statement 7310.04 § 9(a)(5) provides that once a Unit Team refers an inmate for CCF placement, that inmate "shall be transferred to a camp for intermediate placement ... closer to the inmate's release residence [for] a minimum of a 60 day placement at the camp prior to the acceptance date at the [CCF]." If MCC staff would get their CCF referral paperwork done on time, MCC would be able to provide pre-release conditions by simply sending inmates to less-restrictive facilities.

## Assistance preparing important papers

A wide variety of programs are available to help inmates successfully reintegrate into the community. The U.S. Department of Labor offers the Federal Bonding Program, a free service which provides businesses with up to $25,000 in insurance, in the form of fidelity bonds, if they hire a former inmate. See Exhibit 1 attached hereto, discussing Federal Bonding Program in New York State; cf. Bannister, 786 F.Supp.2d at 661 ("Ex-offenders have difficulty meeting requirements of bonding against theft, required in many service businesses."). The Work Opportunity Tax Credit offers tax credits to employers who hire a returning inmate within one year of release. Prison staff can provide copies of, and instructions for completing, the forms necessary to take advantage of these programs. The same can be done with respect to forms for inmates to apply for public assistance programs. For inmates who desire to attend some

form of higher education upon release, college catalogs, access to admissions staff and forms, and advance preparation of FAFSA and state aid forms would ensure inmates leave prison with specific educational goals. With the right assistance from BOP computer technicians, most if not all of these and similar forms could be automatically populated with data from the inmate management databases, so that all local staff would have to do is select and print pre-filled-in forms for signature and processing. At the very least, MCC can make packets of important forms <u>available</u> to inmates.

## Cooperation with local agencies and services

The Second Chance Act made millions of dollars in funding available for reentry initiatives. In the recent past, MCC has allowed volunteers from The Fortune Society, Hostos Community College, and the Department of Labor to visit the facility and speak to inmates. These types of activities should be made a frequent and regular occurrence, and similar organizations undoubtedly have a wide range of ideas for reentry preparation. The New York City College of Technology in Brooklyn offers subsidized education and training to reentrants, funded by the Second Chance Act, which inmates can be permitted to attend. The Eastern District of New York's "Offender Workforce Development Program" offers counseling and assistance in searching for and securing employment. See Michelle A. Powell, Report on Workforce Development Initiatives in the Eastern District of New York (2011). MCC can and should be making use of these resources.

## Other options

The BOP, of course, has a wealth of expertise and resources available to

it to advance society's compelling interest in successful reintegrations. There are many more options in addition to those discussed above which are "practicable."

     d.   The balance of hardships tips decidedly in petitioners' favor

In performing the "balance of hardships" inquiry, the Court must determine "which of the two parties would suffer more grievously if the preliminary injunction motion were wrongly decided." Tradescape.com v. Shivaram, 77 F.Supp.2d 408, 411 (S.D.N.Y. 1999)(footnote omitted).

Here, petitioners' injunction seeks to do, in essence, three things: (1) compel the respondents to evaluate petitioners for CCF placement, which the respondents have a legal obligation to do anyway; (2) compel the respondents to investigate why and how far MCC is behind in its CCF duties; and (3) compel the respondents to evaluate the practicability of several specific proposals for satisfying its obligations under § 3624(c)(1) to provide pre-release conditions regardless of pre-release location. If the motion is wrongly decided against the petitioners, they will continue to be deprived of their rights under § 3624, the realization and protection of which Congress has decided are essential to advancing society's compelling interest in successful reintegration. If it is wrongly decided against the respondents, at worst they will have to examine and explain the state of their CCF referrals, and investigate and report on pre-release conditions they might or might not have considered anyway. Offsetting any potential burdens from such investigations will be the fact that the resulting reports will provide useful information to other BOP components, the courts, Congress, and the public. Congress has specifically required the BOP to make annual reports to the Senate and House Judiciary Committees of "any ... information useful to the committees in determining if the Bureau is

utilizing community correctional facilities in an effective manner." 18 U.S.C. § 3624(c)(5). The reports which would necessarily flow from petitioners' requested injunction certainly comport with this command.

Thus, with the balance of risks so heavily in favor of petitioners, it is clear that petitioners "would suffer more grievously if the preliminary injunction motion were wrongly decided" than respondents.

## Conclusion

For the foregoing reasons, this Court should GRANT petitioners' motion and Order the respondents to:

A.   Immediately evaluate the petitioners for CCF placement in good faith and, if such placement is determined to be warranted, take all necessary steps to refer them for such placement accordingly;

B.   Immediately investigate and prepare a report supported by sworn declarations on the current state of MCC's CCF referral duties, including the number of inmates within the "final months" of their sentence who have not been evaluated or referred for CCF placement;

C.   Immediately investigate whether the pre-release conditions proposed in this memorandum as interim solutions to MCC's CCF referral failures are "practicable" within the meaning of 18 U.S.C. § 3624(c)(1) and, if so, to take steps to immediately implement them; and

D.   Grant such other and further relief as this Court deems just and equitable under the circumstances.

Respectfully submitted,

Date: 5/19/14

JEREMY ZIELINSKI
Lead Petitioner, Pro Se
Register No. 25835-018
Metropolitan Corr. Center
150 Park Row
New York, NY 10007


Date: 5/19/14

JABAREE PERRY
Petitioner, Pro Se
Register No. 57969-056
Metropolitan Corr. Center
150 Park Row
New York, NY 10007


Date: 5/19/14

MICHAEL NAGELL
Petitioner, Pro Se
Register No. 25969-038
Metropolitan Corr. Center
150 Park Row
New York, NY 10007


Date: 5/19/14

MICHAEL MATERASSO
Petitioner, Pro Se
Register No. 58703-054
Metropolitan Corr. Center
150 Park Row
New York, NY 10007


Date: 5/19/14

DAVID BABENZIEN
Petitioner, Pro Se
Register No. 18656-052
Metropolitan Corr. Center
150 Park Row
New York, NY 10007

-- EXHIBIT 1 --



# Fact SHEET

# New York State
# Federal Bonding Program

**Q. What is the NYS Federal Bonding Program?**

**A.** It is a unique tool to help a "high risk" job applicant get and keep a job. The program issues Fidelity Bonds, and is sponsored by the New York State Department of Labor.

**Q. What is a Fidelity Bond and what does it cover?**

**A.** It is a business insurance policy that protects the employer in case of any loss of money or property due to employee dishonesty.

**Q. How does the bond help someone get a job and who is eligible?**

**A.** The bond is given to the employer for six months free-of-charge and serves as an incentive to the company to hire a job applicant from one of several target groups, such as:
- People with poor credit
- People who declared bankruptcy
- Welfare recipients
- Ex-offenders
- Recovering substance abusers (alcohol, drug abuse)
- Youth who have participated in any State- or local-operated summer or year-round youth program
- People who lack a work history
- People with a dishonorable military discharge

After six months, the employer has the option to purchase continued coverage.

**Q. What restrictions exist in the program's bond coverage?**

**A.** The worker must meet the legal age for working in New York State and be paid wages with Federal taxes automatically deducted. Any full- or part-time job is covered, as well as long-term temporary and temporary-to-permanent positions.

**Q. Since employers buy Fidelity Bond insurance to protect against employee dishonesty, why is the program's bond needed?**

**A.** Fidelity Bonds that employers purchase do not cover anyone who has a poor credit history or has committed "a fraudulent or dishonest act."



NYS
DEPARTMENT
OF LABOR
PROTECT : ASSIST : CONNECT

**Q. Can bonding be issued to cover an already employed worker?**

**A.** Yes. A bond can be issued to cover a current employee who is not bondable under the employer's insurance, and needs the program's bonding in order to secure a promotion to a new job requiring bonding or to prevent being laid off or terminated.

**Q. Who must request issuance of the Fidelity Bond?**

**A.** Either the employer or the job applicant may ask that a bond be issued. This request should be made to the nearest Local Bonding Coordinator.

**Q. How much bond insurance coverage will be issued?**

**A.** A total of $5,000 bond coverage is usually issued, with no deductable amount of liability for the employer. Bonds come in amounts of $5,000, $10,000, $15,000, $20,000 or $25,000. Bonds above $5,000 must have both justification and approval by the State Bonding Coordinator.

**Q. How much paperwork is involved?**

**A.** None. Once the date is set for the applicant to start work, the bond can be issued instantly. The employer signs no papers, and keeps no special records since the bond is self-terminating.

**To apply, contact your nearest Local Bonding Coordinator.**

The complete list of Local Bonding Coordinators in New York with contact information is available at:
**http://www.labor.ny.gov/businessservices/services/fbp.shtm**

**NYS Department of Labor**
**Bonding Coordinator**                    **(518) 485-2151**

PROTECT *all Workers*
ASSIST *the Unemployed*
CONNECT *Employers and Workers*

The New York State Department of Labor is an Equal Opportunity Employer/Program.
Auxiliary aids and services are available upon request to individuals with disabilities.



www.labor.ny.gov

**NYS**
**DEPARTMENT**
OF **LABOR**
PROTECT | ASSIST | CONNECT